**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |
|---|---|
| ) | |
| ) | |
| WELLS FARGO BANK, N.A., as Trustee ) | |
| for the Registered Holders of ML-CFC ) | |
| Commercial Mortgage Pass-Through ) | |
| Certificates, Series 2006-3, acting by and ) | |
| through its special server, TORCHLIGHT ) | |
| LOAN SERVICES, LLC, a Delaware ) | Case No.: 13 C 00758 |
| limited liability company, ) | |
| ) | |
| Plaintiffs, ) | Judge Joan H. Lefkow |
| ) | |
| v. ) | |
| ) | |
| RLJ LODGING TRUST, a Maryland real ) | |
| estate investment trust, ) | |
| ) | |
| Defendant. ) | |
| ) | |
| ) | |

## OPINION AND ORDER

Plaintiffs Wells Fargo Bank, N.A. ("Wells Fargo"), and its special servicer, Torchlight

Loan Services, LLC ("Torchlight"), filed suit against RLJ Lodging Trust ("RLJ Trust" or "the

Trust") for breach of a guaranty. The guaranty was executed in connection with a loan Wells

Fargo's predecessor made to a third party affiliated with the Trust. Before the court is RLJ

Trust's motion to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(3).

(Dkt. 9). For the reasons stated below, the motion is denied.

# BACKGROUND[1]

## I. The Parties

### A. The Plaintiffs

Plaintiff Wells Fargo is a national banking association with its main office in South Dakota. It is the trustee of a real estate mortgage investment conduit, ML-CFC Commercial Mortgage Trust 2006-3, Commercial Mortgage Pass-Through Certificates, Series 2006-3 ("the Mortgage Trust"). Plaintiff Torchlight, a nominal party, is a Delaware limited liability company that is the special servicer for the Mortgage Trust.

### B. The Defendant

Defendant RLJ Trust is a Maryland real estate investment trust with its principal place of business in Bethesda, Maryland. None of its individual trustees are citizens of Illinois. The Trust does not directly own any property in Illinois, has no office, employees, or agent for service in Illinois, and holds no bank accounts in Illinois. In 2011, the Trust filed an income tax return in Illinois stating its total sales inside Illinois amounted to $29,457,327, but it paid no income tax in the state because it had no business income apportionable to Illinois. Four Illinois

---

[1]     In ruling on this motion, the court considers proffered materials relevant to the issue of jurisdiction. The following facts are taken from the complaint and from the exhibits the parties attached to their pleadings and briefs  related to the motion to dismiss, as were exposed during the jurisdictional discovery the court allowed the parties to take. (Dkt. 25). In ruling on RLJ Trust's motion to dismiss for lack of personal jurisdiction, the court may consider matters outside the pleadings, such as affidavits and discovery materials. *Hollinger Int'l, Inc.* v. *Hollinger, Inc.*, No. 04 C 0698, 2005 WL 589000, at *10 (N.D. Ill. Mar. 11, 2005); *Cont'l Cas. Co.* v. *S. Co.*, 284 F. Supp. 2d 1118, 1124 n.4 (N.D. Ill. 2003); *see also* Charles Alan Wright & Arthur R. Miller, 4 FEDERAL PRACTICE AND PROCEDURE § 1067.6 (3d ed. 2002). The plaintiff's allegations are presumed true, to the extent they are found uncontroverted by the Trust's affidavits. Disputed facts are resolved in Wells Fargo's favor. *See Purdue Research Found.* v. *Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003).

residents purchased 4.36% of the Trust's stock in its 2011 initial public offering, which represented a $19,626,182.10 investment. The Trust pays dividends to its Illinois shareholders.

Trust representatives have visited Illinois for various business meetings. In May 2011, RLJ Trust's President and CEO, Thomas Baltimore, its Executive Vice President and Chief Investment Officer, Ross Bierkan, and its Executive Vice President and Chief Financial Officer, Leslie Hale, visited Illinois to solicit purchasers for its initial public offering. In March 2012, Baltimore and Bierkan attended a lunch meeting in Chicago with the CEO of the largest hotel management company for the hotels that RLJ Trust's subsidiaries (discussed below) own in Illinois, White Lodging Services. Additionally, Howard Isaacson, Senior Vice President of Asset Management, visited hotel properties owned by subsidiaries of the Trust in Illinois twice in the past two years to review budgets with White Lodging Services. In March 2012, Baltimore and Bierkan met with Hyatt Hotels in Chicago regarding a potential hotel portfolio purchase, but this meeting did not result in any transaction. Bierkan also attended the 2012 Ryder Cup golf event as Hyatt's guest.[2] The Trust conducts quarterly conference calls with its investors, some of whom are Illinois residents.

The Trust has a website accessible to Illinois residents that details its "portfolio of 150 properties, comprised of 148 hotels with more than 22,300 rooms and one planned hotel

---

[2]     Wells Fargo points to contacts that the Trust had with Illinois in 2013 as well. Specifically, in March 2013, Baltimore met with potential investors in Chicago and updated existing Illinois investors on RLJ Trust's performance. In June 2013, Baltimore and Hale attended a national real estate investment meeting in Chicago and met with existing and potential investors during their trip. The court will not consider these contacts because "[j]urisdiction ordinarily is determined by the facts that exist when the case is filed." *Johnson* v. *Burken*, 930 F.2d 1202, 1205 (7th Cir. 1991) (internal citations omitted). The 2013 Illinois activities took place after Wells Fargo filed suit in this court on January 30, 2013. (Dkt. 1.)

conversion, located in 22 states and the District of Columbia."[3] (Dkt. 44 Ex. C.) The website lists contact information for the properties and for some Trust personnel.

The Trust is the general partner of a limited partnership, RLJ Lodging Trust, L.P. ("RLJ L.P." or the "L.P."). The Trust owns 99.2% of the L.P. and funded the L.P. by using the net proceeds from the Trust's 2011 initial public offering. The L.P., in turn, is the sole member of various limited liability companies across the country. Each limited liability company owns one hotel. The L.P. owns 13 Illinois limited liability companies (the "Illinois LLCs"), each of which owns a hotel in Illinois. The hotels are managed by outside management companies but L.P. employees occasionally visit the LLCs' Illinois properties and have final say over the hiring of managers for the properties.

The Trust describes its relationship with the L.P. in its public securities filings. For example, in the Trust's 2012 Form 10-K, the Trust states that "[s]ubstantially all of our assets are held by, and all of our operations are conducted through, our operating partnership [RLJ L.P.]." (Dkt. 44 Ex. B at 6.) The Trust makes similar statements throughout its 10-K statement and a 2012 10-Q statement. The L.P. reports to the Trust, and the Trust's Board of Trustees is involved in property purchasing decisions.

All officers of RLJ Trust are employed by the L.P. For example, Hale is the CFO of both the Trust and the L.P. and is Executive Vice President of the Trust and Senior Vice President of the L.P. She is also a vice president of all of the individual property limited liability companies, including the Illinois LLCs. She uses just one email address, her name "at RLJLodgingTrust.com," in all of these capacities. (Dkt. 44 Ex. E at 9.) Carl Mayfield is Senior

---

[3]     As discussed below, the Trust contests whether it holds itself out as owning hotel properties.

4

Vice President of Design and Construction for the L.P. and for the Trust and is also a vice president for all of the limited liability companies. His salary comes from RLJ L.P. but he also receives shares and dividends from the Trust based on the advice he gives to the Trust in his role as one of its trustees. Isaacson testified that he believes that RLJ L.P. employs him but he does not "really know specifically." (Dkt. 44 Ex. K at 3.)

The limited liability companies, including the Illinois LLCs, have no employees and the L.P. is the sole member of each limited liability company. As far as Isaacson is aware, the individual limited liability companies have never held any meetings, nor do they compensate their officers (all also officers of the Trust and employees of the L.P.).

### C. The Parties' Dispute

As the trustee of the Mortgage Trust, Wells Fargo is the successor-in-interest to the right, title, and interest in a guaranty originally executed in favor of Wachovia by the Trust's predecessors. (Wells Fargo has since succeeded to Wachovia's rights.) That guaranty was executed in connection with a $5,661,634 loan for a Wisconsin hotel that Wachovia made to RLJ II - C Goshen, LLC, and RLJ II - C Goshen Lessee, LLC (the "Borrowers") in 2006. On June 14, 2006, the same date on which Wachovia made the loan to the Borrowers, RLJ Lodging Fund II, L.P., and RLJ Lodging Fund II, L.P. (PF #1), L.P. (the "Original Guarantors"), executed the original guaranty in favor of Wachovia. The Original Guarantors merged into RLJ Trust in 2011, and RLJ trust thus succeeded to, and became liable for, the obligations of the Original Guarantors under the guaranty.

On March 20, 2012, having determined that certain "Events of Default" had occurred under the terms of the loan documents, Wells Fargo and Torchlight (together, "the plaintiffs")

declared the entire outstanding principal balance of the loan and all accrued and unpaid interest thereon to be immediately due and payable. When the Borrowers had not repaid the loan by April 20, 2012, the plaintiffs filed a foreclosure action in the Superior Court of Elkhart County, Indiana.

In the course of the foreclosure action, the Borrowers filed an answer and affirmative defenses contesting the action. By contesting the action, the Borrowers triggered the terms of the guaranty to pay the full balance due.[4] On March 30, 2012, Wells Fargo sent a letter to the Borrowers and RLJ Trust demanding full payment. RLJ Trust did not pay the total losses, prompting the plaintiffs to file this suit on January 30, 2013. The one-count complaint alleges that RLJ Trust breached the terms of the guaranty. RLJ Trust now moves to dismiss for lack of personal jurisdiction and improper venue.

## LEGAL STANDARD

Rule 12(b)(2) permits dismissal of a claim based on lack of personal jurisdiction. *See* Fed. R. Civ. P. 12(b)(2). The burden of proof on jurisdictional challenges is on the party asserting jurisdiction. *RAR, Inc.* v. *Turner*, 107 F.3d 1272, 1276 (7th Cir. 1997). The court will "read the complaint liberally, in its entirety, and with every inference drawn in favor" of the plaintiff. *Central States, Se. & Sw. Areas Pension Fund* v. *Phencorp Reinsurance Co.*, 440 F.3d 870, 878 (7th Cir. 2006) (quoting *Textor* v. *Bd. of Regents of N. Ill. Univ.*, 711 F.3d 1387, 1393 (7th Cir. 1993)). Disputes concerning relevant facts are resolved in favor of the plaintiff. *See*

---

[4] The guaranty provides that the guaranteed obligation includes the unpaid balance of the debt if the borrower should contest a foreclosure action by, for example, claiming any defense. RLJ Trust contends that the Borrowers were merely asserting "boilerplate defenses." (Dkt. 9 at 2-3 n.2.) As RLJ Trust notes, however, that dispute is not before the court at this time.

*Purdue Research Found.* v. *Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003) (citing *Nelson* v. *Park Indus.*, 717 F.2d 1120, 1123 (7th Cir. 1983)).

"In ruling on a motion to dismiss under Rule 12(b)(3), the court takes all the allegations in the complaint as true unless contradicted by the defendant's affidavit and may examine facts outside the complaint." *Interlease Aviation Investors II (ALOHA) L.L.C.* v. *Vanguard Airlines, Inc.,* 262 F. Supp. 2d 898, 913 (N.D. Ill. 2003). The court is "not obligated to limit its consideration to the pleadings nor convert the motion to one for summary judgment." *Cont'l Cas. Co.* v. *Am. Nat'l Ins. Co.,* 417 F.3d 727, 733 (7th Cir. 2005).

ANALYSIS

## I.      Personal Jurisdiction

Wells Fargo argues that this court has personal jurisdiction over RLJ Trust by either of two means.  First, it argues that RLJ Trust's contacts with Illinois are sufficient to confer general jurisdiction.  Second, it argues that this court has jurisdiction over RLJ Trust through RLJ L.P., of which RLJ Trust is the sole general partner and 99.2% owner, because (1) the L.P.'s contacts with Illinois are sufficient to confer general jurisdiction over it; (2) the L.P. owns the 13 Illinois LLCs, which also supports jurisdiction over the L.P.; and (3) because of the L.P.'s close relationship with the Trust, the L.P.'s Illinois contacts can be imputed to the Trust.

### A.      Legal Standard for Personal Jurisdiction

At the outset, the court notes that, as it is sitting in diversity jurisdiction, it has personal jurisdiction over RLJ Trust to the extent that an Illinois court could exercise personal jurisdiction.  *See Klump* v. *Duffus*, 71 F.3d 1368, 1371 (7th Cir. 1995).  Illinois allows for personal jurisdiction to the extent authorized by the Fourteenth Amendment's due process clause, which merges the federal constitutional and state statutory inquiries together.  *See*

*Tamburo* v. *Dworkin*, 601 F.3d 693, 700 (7th Cir. 2010); 735 Ill. Comp. Stat. 5/2-209(c). Under the Illinois long-arm statute, personal jurisdiction can be general or specific. *uBid, Inc.* v. *GoDaddy Grp., Inc.*, 623 F.3d 421, 425 (7th Cir. 2010). General jurisdiction allows a defendant to be haled into an Illinois court if it has "'continuous and systematic general business contacts' with the forum state." *Id.* at 425-26 (quoting *Helicopteros Nacionales de Colombia, S.A.* v. *Hall*, 466 U.S. 408, 415-16, 104 S. Ct. 1868, 80 L. Ed. 2d 404 (1984)). In Illinois, this is known as the "doing business standard," a standard that "is rather high, because general jurisdiction establishes that the corporation has [effectively] taken up residence in Illinois and, therefore, may be sued on causes of action both related and unrelated to its activities in Illinois." *Sabados* v. *Planned Parenthood of Greater Ind.*, 882 N.E.2d 121, 128, 378 Ill. App. 3d 243, 317 Ill. Dec. 547 (2007) (internal citations omitted).[5]

In ruling on the motion to dismiss for lack of personal jurisdiction, the court must resolve all conflicts in the parties' affidavits in favor of the plaintiff but will take as true facts in the defendants' affidavits that are unrefuted by the plaintiff. *See Carris* v. *Marriott Int'l, Inc.*, No. 03 C 1480, 2004 WL 5550478, at *1 (N.D. Ill. Mar. 30, 2004). To determine whether a party's contacts with Illinois are sufficiently "continuous and systematic" to subject it to general jurisdiction, courts consider factors such as (1) whether and to what extent the defendant

---

[5]     It is also possible to exercise specific jurisdiction over a party. Specific jurisdiction grows out of a defendant's particular contacts with the state and is present when "(1) the defendant has purposefully directed his activities at the forum state or purposefully availed himself of the privilege of conducting business in that state, and (2) the alleged injury arises out of the defendant's forum-related activities." *Tamburo*, 601 F.3d at 702.; *see also Mobile Anesthesiologists Chi., LLC* v. *Anesthesia Assocs. of Hous. Metroplex, P.A.*, 623 F.3d 440, 443-44 (7th Cir. 2010). Because Wells Fargo makes no argument that this court has specific jurisdiction over RLJ Trust, it is necessary to evaluate only whether this court has general jurisdiction over it. *Hartford Cas. Ins. Co.* v. *Firefox Printing & Packaging, Inc.*, No. 10 C 50298, 2011 WL 4345850, at *4 (N.D. Ill. Sept. 15, 2011).

conducts business in Illinois; (2) whether the defendant maintains an office or employees in Illinois; (3) whether the defendant sends agents into Illinois to conduct business; (4) whether the defendant advertises or solicits business in Illinois; and (5) whether the defendant has designated an agent for service of process in Illinois. *See, e.g., Zimmerman* v. *JWCF, LP*, No. 10 C 7426, 2011 WL 4501412, at *5 (N.D. Ill. Sept. 28, 2011) (*quoting Corus Int'l Trading Ltd.* v. *Eregli Demir Ve Celik Fabrikalari, T.A.S.*, 765 F. Supp. 2d 1079, 1083 (N.D. Ill. 2011)).

**B.      Personal Jurisdiction over RLJ Trust through Its Contacts with Illinois**

The first question the court must address is whether RLJ Trust has sufficient direct contacts with Illinois to confer general jurisdiction. RLJ argues that it is not doing business in Illinois of such a character and to such an extent to qualify for general jurisdiction in Illinois. As stated in the declaration of Leslie D. Hale, the Executive Vice President and Chief Financial Officer of RLJ Trust, the Trust is not a resident of Illinois, none of its trustees are residents of Illinois, it has no office or any other real property in Illinois, it has no agent for service in Illinois, it has no employees in Illinois, it does not advertise or solicit business in Illinois, and it holds no bank accounts in Illinois. (Dkt. 9 at Hale Decl. ¶¶ 6-15.)

In response, Wells Fargo argues that RLJ Trust satisfies the doing business requirement in five ways. First, it argues RLJ Trust does business in Illinois through income it derives from its Illinois properties and by filing Illinois income tax returns on those Illinois properties (although it concedes that RLJ Trust does not derive this income directly but instead through RLJ L.P.). Second, it argues RLJ Trust fulfills the standard by selling stock to Illinois investors. In particular, it notes that four Illinois residents purchased 4.36% of the Trust's stock in its 2011 initial public offering, accounting for $19,626,182.10. Combined with profits from the rental of

hotel rooms, it claims RLJ Trust received roughly $50,000,000 from Illinois in 2011 alone, and

that, while the Trust's 2012 Illinois tax return has not yet been made available, public filings

indicate the Trust's assets performed "even better" in 2012. (Dkt. 44 at 7 n.5.) Third, Wells

Fargo argues that RLJ Trust regularly contacts and meets with investors and potential investors

in Illinois by way of various specific examples detailed below. Fourth, Wells Fargo argues that

RLJ Trust uses its website to interact with investors and promote hotels, and that the website is a

"hybrid website" because it provides links and contact information for its Illinois properties and

allows users to submit inquiries. Finally, Wells Fargo argues RLJ Trust does business in Illinois

by paying its shareholders dividends.

     The Trust argues that the fact that 4.36% of its shares are owned by Illinois investors is

insufficient to support a finding of general jurisdiction. But that argument is belied by the case

law, which has indicated that equivalent amounts of sales of goods, which courts have found

analogous to the sale of securities, *see Shepherd Investments International Ltd.* v. *Verizon

Communications Inc.*, 373 F. Supp. 2d 853, 864 (E.D. Wisc. 2005), are sufficient where those

amounts are coupled with other jurisdictional factors. For example, Illinois sales totaling as little

as 1.2% of overall gross sales have been held sufficient to confer general jurisdiction where the

defendant also negotiated with, visited, and solicited business from Illinois entities, purchased

equipment in Illinois, maintained a website through which Illinois consumers could purchase the

defendant's products, and employed an individual who worked from her Chicago

residence—albeit for fewer than five months. *See Hartford Cas. Ins. Co.* v. *Foxfire Printing &

Packaging, Inc.*, No. 10 C 50298, 2011 WL 4345850, at *5 (N.D. Ill. Sept. 15, 2011).

Similarly, in *Michael J. Neuman & Associates, Ltd.* v. *Florabelle Flowers, Inc.*, 15 F.3d 721, 725 (7th Cir. 1994), the Seventh Circuit held jurisdiction to be proper despite the defendant's low sales in Illinois. The defendant had sales of $27,000 in Illinois in 1987 and $47,376 in 1988. *Id.* at 724. The court did not discuss total sales in those two years, but explained that national sales for 1992 were projected to be $4 million and, as of July 1992 (which was "not a good year" for the defendant), Illinois sales totaled between $10,000 and $15,000. *Id.* The record also reflected that the defendant had no affiliates, subsidiaries, offices, agents, employees, or property in Illinois, nor did it advertise in the state. It employed one independent sales representative who resided in Wisconsin but she had customers in Illinois whom she periodically solicited by telephone from her Wisconsin office, resulting in trips to Illinois on business once every six to eight weeks. The defendants conceded they had conducted business in Illinois prior to 1992 but argued that, because the complaint was served in 1992, the court should only consider sales from then forward. The Seventh Circuit disagreed, explaining that the defendant's low 1992 sales were inconsequential, as they did not demonstrate that the defendant "intended to modify its business relationship with Illinois." *Id.* at 725.

The Trust protests that the Illinois shareholders' 4.36% ownership interest is not comparable to the gross sales amounts in these cases because purchase of the shares was a one-time event that occurred when the Trust went public. But 4.36% stock ownership by Illinois residents is not the extent of RLJ Trust's financial ties to Illinois. As evidenced by RLJ Trust's 2011 Illinois corporate income tax return, the Trust's total revenue from its hotels in Illinois in 2011 amounted to $29,457,327. (Dkt. 44 Ex. M at 3.) This amount represents roughly 12% of the Trust's total 2011 income. (*Id.*) The Trust argues that its income tax return also reflects that

it had zero net income apportionable to Illinois and paid no taxes here. It also insists that this is "only a fraction" of its total nationwide revenue. (Dkt. 49 at 5.) The court rejects the argument that 12% is "only a fraction." Other cases have found that similar percentages are "a significant amount and cannot be characterized as inadvertent, trivial, or sporadic." *Kavo Am. Corp.* v. *J.F. Jelenko & Co.*, No. 00 C 1355, 2000 WL 715602, at *4 (N.D. Ill June 2, 2000). For example, in *Kavo*, the court found it could exercise general personal jurisdiction over the defendant who generated roughly 10% of its income from its sales in Illinois, solicited Illinois consumers through its website, and maintained two sales representatives in Illinois. *Id.*

RLJ Trust argues that the 2011 income is not attributable to it, but only to RLJ L.P. (presumably as owner of the Illinois LLCs). This argument is also unavailing. Aside from the question of whether this court may exercise jurisdiction over RLJ Trust based on its 99.2% ownership of RLJ L.P. (discussed below), there is a separate question of whether the Trust itself is doing business in Illinois when it profits from RLJ L.P.'s in-state activities. The court in *Graco, Inc.* v. *Kremlin, Inc.*, 558 F. Supp. 188, 192-93 (N.D. Ill. 1982), held that a foreign parent that benefits substantially from its Illinois subsidiary's in-state activities is doing business in Illinois. The issue in *Graco* was whether the court had jurisdiction over a French corporation whose wholly owned subsidiary was an Illinois corporation that managed an independent distribution network in the United States. Although the parent and subsidiary were "clearly two separate corporations," the Illinois subsidiary purchased "a large percentage" of its equipment from the French parent, was the only source of the French parent's products in the United States, and the French parent "obviously receive[d] substantial revenue and economic benefit from [the subsidiary's] sales in Illinois." *Id.* at 191-92. The "substantial economic benefit" that the French

parent received from its subsidiary's contacts in the state led the court to the conclusion that the parent was "doing business" in Illinois, "even though its dealings here are indirect." *Id.* at 193; s*ee also Abbott Labs.* v. *Mylan Pharm., Inc.*, No. 05 C 6561, 2006 WL 850916, at *4 (N.D. Ill. Mar. 28, 2006).

Even still, the Trust protests that, under *Richter* v. *Instar Enterprises International*, 594 F. Supp. 2d 1000, 1007 (N.D. Ill. 2009), Illinois sales must be "substantial" to support general jurisdiction but its sales here were not. In *Richter*, the court held that the defendant had insufficient contact with Illinois to confer jurisdiction, in part defendant's Illinois sales represented just one tenth of one percent of defendant's overall sales. *Id.* Likewise, the cases on which *Richter* relied to come to that conclusion also involved Illinois sales lower than the Trust's sales here. *See Tate & Lyle Sucralose, Inc.* v. *Hebei Sukeri Sci. & Tech. Co.*, No. 06 C 2102, 2006 WL 3391421, at *1 (C.D. Ill. Nov. 22, 2006) (Illinois sales constituted less than 0.1% of the defendant's total revenue); *McGill* v. *Gigantex Techs. Co.*, No. 05 C 5892, 2005 WL 3436403, at *3 (N.D. Ill. Dec. 12, 2005) (Illinois sales over four-year period ranged from 0.3% to 3.5% of the defendant's total sales); *Berndorf Belt Sys., Inc.* v. *Harwood Rubber Prods., Inc.*, No. 01 C 2202, 2001 WL 800090, at *1 (N.D. Ill. July 16, 2001) (Illinois sales over four-year period ranged from 0.4% to 1.1% of the defendant's annual gross revenue). As discussed above, RLJ Trust's Illinois income includes the purchase by Illinois residents of 4.36% of its stock, and 12% of its annual revenue is derived from Illinois hotels.

*Richter* and the cases cited therein are also distinguishable because in none did the defendant advertise or solicit business in Illinois. *See Richter*, 594 F. Supp. 2d at 1006-07; *Tate*, 2006 WL 3391421, at *1; *McGill*, 2005 WL 3436403, at *2; *Berndorf*, 2001 WL 800090, at *1.

Where a defendant travels multiple times to Illinois to solicit investors, that is a strong factor supporting the finding of general jurisdiction. *See Coburn Grp., LLC* v. *Whitecap Advisors, LLC*, No. 07 C 2448, 2007 WL 2948367, at *5 (N.D. Ill. Oct. 3, 2007). For example, in *Coburn*, the defendant's founder traveled to Chicago four times over a year to meet with the plaintiff and to discuss investment opportunities with Illinois-based investors. *Id.* at *4. His employee traveled to Illinois to attend holiday parties with the plaintiff in December 2004 and December 2005. The defendant also sent the plaintiff materials regarding the defendant's investments and directed "several payments" to the plaintiff's Chicago bank account. *Id.* The court held that these contacts were sufficient to exercise general jurisdiction over the defendant in Illinois.

RLJ Trust's representatives' contacts with Illinois resemble those of the defendant in *Coburn*. In May 2011, RLJ Trust's President and CEO, Thomas Baltimore, its Executive Vice President and Chief Investment Officer, Ross Bierkan, and its Executive Vice President and Chief Financial Officer, Leslie Hale, visited Illinois to solicit purchasers for its initial public offering. In March 2012, Baltimore and Bierkan attended a lunch meeting in Chicago with the CEO of the largest hotel management company for the Illinois LLCs' hotels, White Lodging Services. In March 2012, Baltimore and Bierkan met with Hyatt Hotels in Chicago regarding a potential hotel portfolio purchase, but this meeting did not result in any transaction. Bierkan also attended the 2012 Ryder Cup golf event as Hyatt's guest.[6] Moreover, the Trust distributes dividends to its Illinois shareholders. For example, the Trust announced in a November 7, 2012 press release that it had declared a cash dividend for the third quarter of 2012 of $0.615 per

---

[6]     Additionally, and outside of travel to Illinois to seek investors, Howard Isaacson, the Trust's Senior Vice President for Asset Management, visited hotels owned by the Illinois LLCs twice in the past two years to review budgets with White Lodging Services. (Dkt. 44 at 8.)

share, or $0.66 on an annual basis. (Dkt. 44 Ex. P at 2.) Finally, RLJ Trust conducts quarterly conference calls with its investors, some of whom are Illinois residents.

These contacts go beyond the limited purchases from and "one trip to [the forum state] by [the defendant's] chief executive officer" that the Supreme Court held insufficient to establish jurisdiction in *Helicopteros*, 466 U.S. at 416, the principal case on which RLJ Trust relies. Taken together, the Trust's contacts with Illinois to solicit business and keep investors apprised of the Trust's activities through the visits by Trust officers to Illinois and the conference calls, combined with the revenue derived from Illinois and shares of stock held by Illinois investors, are sufficient for a finding of general jurisdiction.

Although the Trust operates a website that reaches consumers in Illinois, this website is largely passive in nature and does little to contribute to the Trust's contacts with Illinois. For example, consumers cannot purchase products through the website. *See, e.g., Rosier* v. *Cascade Mountain, Inc.*, 855 N.E. 2d 243, 250, 367 Ill. App. 3d 559, 305 Ill. Dec. 352 (2006) (finding no general jurisdiction where there was no evidence that the defendant engaged in "actual commerce" through its website); *Haemoscope Corp.* v. *Pentapharm AG*, No. 02 C 4261, 2002 WL 31749195, at *5 (N.D. Ill. Dec. 9, 2002) (finding a defendant was not subject to general jurisdiction where its website "offer[ed] general information about the company, its products, and/or services" but did "not allow users to purchase defendants' products" or "contain pricing information or allow users to download a catalog"). That it allows users to request additional information does not render it an "active" or even a "hybrid" site. *Haemoscope*, 2002 WL 31749195, at *5.

Nevertheless, the court concludes that general jurisdiction is proper based on the Trust's other contacts with Illinois, including the extent to which RLJ Trust conducts business in Illinois, the "substantial revenue and economic benefit" it derives from the L.P.'s Illinois activities, *Graco*, 558 F. Supp. at 192, and the fact that it has sent its agents to Illinois on numerous occasions to solicit and transact business. While any one factor viewed in isolation may not support such a finding, viewing the Trust's Illinois contacts in their totality, the court holds that it is proper to exercise general personal jurisdiction over the Trust.[7]

## C. Personal Jurisdiction over RLJ Trust Through Its Contacts with RLJ L.P.

Even if this court could not exercise jurisdiction over RLJ Trust by virtue of the Trust's own contacts with Illinois, it could by virtue of the L.P.'s contacts with the state.

### i. Personal Jurisdiction over RLJ L.P.

The court first examines whether RLJ L.P. has sufficient contacts with Illinois to confer general jurisdiction. Wells Fargo presents two reasons why this court may exert jurisdiction over RLJ L.P. First, it argues that the L.P. has sufficiently systematic and continuous contacts

---

[7]    The court acknowledges that RLJ Trust does not have a registered agent for service of process in Illinois, nor does it have any employees here. But the sheer amount of revenue derived from Illinois and the Trust's solicitation of business here outweigh those factors. *See, e.g., Abbott Labs.*, 2006 WL 850916, at *3 (holding general jurisdiction was appropriate despite defendant not having physical office or agent in Illinois); *Hartford Cas. Ins.*, 2011 WL 4345850, at *5 (holding that defendant's lack of agent for service of process in Illinois was "not determinative").

Furthermore, the court agrees with RLJ Trust that the filing of an income tax return is not an admission that the Trust is doing business in Illinois. *See, e.g., Zimmerman*, 2011 WL 4501412, at *8 (that the foreign parent filed Illinois tax returns and its Illinois subsidiary did not was not conclusive in analyzing jurisdiction over the parent because the parent was required to file taxes due to subsidiary's corporate form, and the court was "not aware of[ ] any authority holding that personal jurisdiction over a foreign parent is appropriate simply because the parent filed a tax return in the state where its subsidiary does business"). But the court does not agree that the income reported on that return is attributable solely to RLJ L.P. and RLJ Trust does not profit the Trust. Instead, and as discussed above, the court finds that RLJ Trust is doing business in Illinois based in part on the revenue it derives from the L.P.'s ownership of the Illinois LLCs. *See, e.g., Graco*, 558 F. Supp. at 192.

with Illinois for this court to exert jurisdiction over it. Second, it argues that the Illinois LLCs'

contacts with Illinois can be imputed to RLJ L.P. because the L.P. is the sole owners of the

Illinois LLCs, the LLCs have no employees of their own, and the officers of the LLCs are L.P.

employees. RLJ Trust concedes that the L.P.'s employees monitor the hotel properties'

performance, that the L.P. has approved a director of sales for an Illinois hotel, that some of its

employees have visited Illinois properties, and that it has funded hotel renovations. But it argues

that Wells Fargo exaggerates the contacts that the L.P.'s employees have had with Illinois and

that these contacts are by no means continuous or systematic.

The court finds that the confluence of the L.P.'s contacts with Illinois, on its own and

through the LLCs, supports a finding that the L.P. is doing business in this state. The evidence

shows that RLJ L.P. is the sole owner of each individual Illinois LLC that owns an Illinois hotel.

(*See generally* Dkt. 44 Ex. G.) RLJ L.P.'s 2011 Illinois tax return shows that the L.P.'s base

income allocable to Illinois was $3,954,610.01. (Dkt. 44 Ex. X at 2.) The L.P., along with the

Trust, have funded property renovations on some of the LLCs' Illinois hotels. (Dkt. 44 Ex. U.)

Moreover, the LLCs appear to be shell companies that are controlled by the L.P. and its

members. For example, the individuals who negotiate the purchase price of hotel properties in

which the Trust invests are Bierkan, Henriksen and Jeff Dauray (the Trust's Vice President for

Acquisitions)—all officers of the Trust and employees of the L.P. (Dkt. 44 Ex. E at 10.)

Additionally, L.P. employees occasionally visit the Illinois properties. (Dkt. 44 Ex. 11 at 5.)

After the management companies that manage the Illinois LLCs' hotels calculate the hotels'

income and expenses, they report that information to RLJ L.P.'s asset management and

accounting departments, the latter of which works under Hale. (Dkt. 44 Ex. E at 10.) The

address registered with the Illinois Secretary of State for each Illinois LLC is the same as the address for both RLJ Trust and RLJ L.P. (*See generally* Dkt. 44 Ex. G.) While it is true that the L.P. does not seek out candidates for the LLC to hire, Isaacson testified that he and his team were presented with the final candidate for general manager for Illinois hotels for review, and the managers were hired only after he and his team approved them. (Dkt. 44 Ex. K at 9.) Emails between an RLJ L.P. employee and a White Lodging employee confirm that Isaacson and/or his team interview and approve hiring of property manager candidates, which would include candidates for the Illinois properties. (*See generally* Dkt. 44 Ex. V.)

The LLCs also do not appear to follow corporate formalities. The L.P. is the sole member of each LLC. (*See generally* Dkt. 44 Ex. G.) Isaacson testified that as far as he is aware, the individual LLCs that own the hotels, of which he is vice president, have never held any meetings. (Dkt. 44 Ex. K at 4.) The Illinois LLCs have no employees, nor do the LLCs compensate their officers. (*Id.* at 4; Ex. 44 Ex. F at 4.) Instead, the officers of the Illinois LLCs are Baltimore, Bierkan, Hale, Mayfield, Isaacson, and Frederick McKalip, a Trust officer and its Senior Vice President for Design and Construction, all of whom are officers of the Trust and employees of the L.P. (Dkt. 44 Ex. J at 3-4.)

Thus, due to the contacts that the L.P.'s employees have with Illinois, both on behalf of the L.P. and on behalf of the LLCs, the court finds that the L.P. is doing business in Illinois.

### ii. Relationship between RLJ Trust and RLJ L.P.

Having determined that there is general jurisdiction over RLJ L.P., the court turns to whether there is general jurisdiction over RLJ Trust by virtue of its relationship with RLJ L.P. "[C]orporate ownership alone is not sufficient for personal jurisdiction." *Cent. States, Se.*, 230

F.3d at 943.  In order for this court to have jurisdiction over RLJ Trust based on its affiliation with RLJ L.P., an exception to the general rule that the contacts of one corporation are not imputed to a corporate affiliate for jurisdictional purposes must apply.  Such an exception exists, for example, where a parent company exerts actual control over a subsidiary, where the subsidiary's only purpose is to conduct the business of the parent, or there are grounds for piercing the corporate veil.[8]  *Id.* at 940, 943-44; *see also Abelesz* v. *OTP Bank*, 692 F.3d 638, 658-59 (7th Cir. 2012) ("Imputation, however, requires an unusually high degree of control or that the subsidiary's corporate existence is simply a formality." (citations omitted)); *Purdue*, 338 F.3d at 788 n.17.

It is not enough that RLJ Trust control, direct, and supervise RLJ L.P. to some extent. *See Alderson* v. *S. Co.*, 747 N.E.2d 926, 944, 321 Ill. App. 3d 832, 254 Ill. Dec. 514 (2001).  "If, however, the subsidiary is conducting its own business, then an Illinois court may not assert *in personam* jurisdiction over the parent simply because it is the parent."  *Id.*  To make this determination, the court will consider such factors as (1) the degree of control exercised by RLJ Trust over RLJ L.P.; (2) the obligations of RLJ L.P. to service RLJ Trust's products: (3) inclusion of RLJ L.P.'s name and address in RLJ Trust's advertising; (4) joint sponsorship of promotional activities; (5) interlocking directorships; (6) the location of RLJ L.P.'s board of directors meetings; and (7) whether RLJ L.P. is authorized to prosecute trademark infringement suits in RLJ Trust 's name.  *See Palen* v. *Daewoo Motor Co.*, 832 N.E.2d 173, 184, 358 Ill. App.

---

[8]     To pierce the corporate veil, Illinois courts require a showing that the subsidiary "is so controlled, and its affairs so conducted by a parent that observance of the fiction of separate identities would sanction a fraud or promote injustice."  *Old Orchard Urban Ltd. P'ship* v. *Harry Rosen, Inc.*, 904 N.E.2d 1050, 1061, 389 Ill. App. 3d 58, 328 Ill. Dec. 540 (2009).  Wells Fargo has not made any showing of fraud or injustice here, and therefore the court will only consider whether RLJ Trust exerts actual control over RLJ L.P.

3d 649, 295 Ill. Dec. 22 (2005) (citing *Wissmiller* v. *Lincoln Trail Motorsports, Inc.*, 552 N.E.2d 295, 298, 195 Ill. App. 3d 399, 141 Ill. Dec. 927 (1990)).

At the outset, the court addresses whether there is jurisdiction over the Trust solely because it is a general partner in a limited partnership, which Wells Fargo argues is subject to jurisdiction in the forum. RLJ Trust did not present any cases to the contrary. At least one judge in this district has come to the conclusion that there is jurisdiction over a general partner of a limited partnership if there is jurisdiction over the limited partnership itself. *Wolfson* v. *S & S Secs.*, 756 F.Supp. 374, 377-78 (N.D. Ill. 1991). Other circuit courts have come to the opposite conclusion. *See Cambridge Literary Props., Ltd.* v. *W. Goebel Porzellanfabrik*, 295 F.3d 59, 67 (1st Cir. 2002) (rejecting contention that "personal jurisdiction over a [limited] partnership automatically conveys personal jurisdiction over each of the partners or at least the general partners" and noting the "diversity of views among various courts" on the issue) (collecting cases).

The court need not resolve this question, however, because there is ample authority to support a finding that it is appropriate to impute RLJ L.P.'s Illinois activities to RLJ Trust. Although RLJ Trust paints itself as conducting wholly separate activities from RLJ L.P., the relationship between the two shares many of the characteristics of relationships that courts in Illinois have found sufficient to assert jurisdiction over the parent. These characteristics include the parent exercising significant control over the subsidiary, commonality of directors or employees between the parent and subsidiary, the parent funding the subsidiary's activities, and the parent holding the subsidiary out as its agent. For example, in *Japax, Inc.* v. *Sodick Co.*, 542 N.E.2d 792, 796-97, 186 Ill. App. 656, 134 Ill. Dec. 446 (1989), the court determined

jurisdiction over the Japanese parent was proper because the Illinois subsidiary's activities were imputed to the parent. The Japanese parent argued that it did not control the subsidiary, that it did not employ any individuals in Illinois, and that it was a wholly separate corporate entity from its subsidiary. *Id.* But there was evidence indicating that the foreign parent "maintain[ed] some control over its subsidiary, or at least maintain[ed] significant connections with it in order to facilitate the sales and servicing of its systems." *Id.* at 797. For example, the parent "loaned" employees to its subsidiary; many or most of the subsidiary's officers and board members were from the foreign parent; the parent "loaned or guaranteed millions of dollars on behalf of its subsidiary"; employees of the parent traveled to the subsidiary to train its personnel, assist in the subsidiary's service activities, and attend trade shows; some visited and inspected the premises of the subsidiary's distributor; and the parent and subsidiary regularly communicated and the subsidiary's officers reported to the parent's managing director. *Id.*

Similarly, in *Smith* v. *Pierce Chemical Co.*, No. 92 C 20141, 1992 WL 280404, at *3 (N.D. Ill. Sept. 22, 1992), the court held it was appropriate to exercise jurisdiction over the foreign parent based on its jurisdiction over the local subsidiary. The factors that led the court to make this finding included that a minority of the subsidiary's officers also worked for the parent; the parent's directors appointed members of and controlled the subsidiary's board of directors; an officer of the parent communicated multiple times per week with the president of the subsidiary and participated in and approved the subsidiary's hiring decisions; the parent approved the subsidiary's budgets and set its profit goals; the parent insured the subsidiary; and the parent and subsidiary sent out joint memoranda. *Id.* Additionally, the court found that the parent held the subsidiary out as its agent. For example, the parent's name appeared on the

subsidiary's stationary and business forms.  *Id.*  Thus the "degree of control" the parent

exercised over the subsidiary was "such that [the subsidiary's] business is deemed that of [the

parent], so that [the parent] is 'doing business'" in Illinois.  *Id.* at *4.

Here, many of the same factors exist.  RLJ Trust insists that it and RLJ L.P. are separate

entities and that the activities of the L.P. (and the LLCs) are not attributable to the Trust because

"those entities carry on their own distinct business."  (Dkt. 49 at 10.)  The Trust's statements,

contained in the various exhibits to Wells Fargo's opposition brief, contradict this argument.  For

example, in RLJ Trust's 2012 Form 10-K, the Trust explained, "[s]ubstantially all of our assets

are held by, and *all of our operations are conducted through*, our operating partnership [RLJ

L.P.]."  (Dkt. 44 Ex. B at 6 (emphasis added).)  Similar statements are littered throughout the

Trust's 10-K and through its first quarter 2012 10-Q.[9]  Evidence that "substantially all" of the

Trust's operations are "conducted through" the L.P. supports the natural conclusion that L.P. is,

in fact, the Trust's agent conducting the Trust's business and not a wholly independent

subsidiary.

Notably, in defining the terms "our company," "we," "us," and "our," in its 2012 10-K

statement, RLJ Trust clarifies that these terms refer to itself "together with its consolidated

subsidiaries, including RLJ Lodging Trust, L.P."  (Dkt. 44 Ex. B at 5.)  Unlike in *Gruca* v. *Alpha*

*Therapeutic Corp.*, 19 F. Supp. 2d 862, 867-68 (N.D. Ill. 1998), where the foreign parent's use

---

[9]      For example, in the section describing RLJ Trust's organizational structure, the Trust states,
"[w]e conduct our business through a traditional umbrella partnership real estate investment trust, or
UPREIT, in which our hotels are indirectly owned by our operating partnership, RLJ Lodging Trust, L.P.,
through limited partnerships, limited liability companies or other subsidiaries.  We are the sole general
partner of our operating partnership and as of December 31, 2012, we owned 99.2% of the OP units in
our operating partnership."  (Dkt. 44 Ex. B at 8.)  In RLJ Trust's 10-Q statement for the quarter ending
March 2012, the Trust explains that "substantially all of the [Trust's] assets are held by, and all of its
operations are conducted through, the Operating Partnership [*i.e.*, RLJ L.P.]."  (Dkt. 44 Ex. A at 9.)

of "our" in its annual report was "consistent with [its subsidiary's] existence as a separate entity," here, the Trust explicitly defined the term "our," among others, as referring to itself along with RLJ L.P.

Additionally, the Trust and the L.P. share officers and employees. For example, Hale is CFO of the L.P. and is Senior Vice President of the Trust. (Dkt. 44 Ex. E at 3-4.) She is also Vice President for all of the individual hotel property LLCs, although she receives no compensation in that capacity. (*Id.* at 4.) She uses only one email address, "at RLJLodgingTrust.com." (*Id.* at 9.) Carl Mayfield is employed by the L.P. as its Senior Vice President of Design and Construction, and is also an officer of the Trust and Vice President of the LLCs. (Dkt. 44 Ex. F at 3.) Even some of the employees are confused by which entity actually employees them. Isaacson, for example, testified that he "believe[s]" he is employed by RLJ L.P. but he does not "really know specifically." (Dkt. 44 Ex. K 3.)

Despite the Trust's protestations to the contrary, shared employees and officers are not the "only true 'commonality' shared by the Trust and L.P." (Dkt. 49 at 12.) The Trust also exerts control over the L.P. RLJ Trust states in its responses to interrogatories that the people involved in the L.P.'s decision to purchase or sell real estate in Illinois include the "entire senior team," and the principal decision makers include Baltimore, Bierkan, Hale, Kate Henriksen (the Trust's Senior Vice President of Investment Analysis and Portfolio Management), and the "RLJ Lodging Trust Board of Trustees." (Dkt. 44 Ex. J at 4-5.) As Hale stated, "[t]he employees of the L.P. are reporting to the directors of the Trust." (Dkt. 44 Ex. E at 10.) Thus, there appears to be significant overlap in employees between the two entities.

Additionally, the Trust funds the L.P. Its 10-Q for the quarter ending March 31, 2012, states that the Trust "contributed the net proceeds from the [initial public offering]. . . to the [L.P.] . . . in exchange for units of limited partnership interest in the Operating Partnership ('OP units'). The Operating Partnership holds substantially all of the [Trust's] assets and conducts substantially all of its business. Upon completion of the IPO, the Company owned approximately 99.1% of the aggregate OP units." (Dkt. 44 Ex. A at 9.)

The Trust insists that its activities are separate from the L.P. because the Trust does not own hotels and is merely an investment vehicle, whereas Wells Fargo argues that the L.P. "exists solely to perform the Trust's business—owning and operating 148 hotels." (Dkt. 44 at 11.) But the Trust does hold itself out publicly as owning hotels. It has stated publicly that "[a]s of March 31, 2012, the Company owned interests in 141 hotels . . . The Company, through wholly-owned subsidiaries, owned a 100% interest in all of its assets. . . ." (Dkt. 44 Ex. A at 9.) It also states on its website that "RLJ Lodging Trust is a self-advised, publicly traded real estate investment trust focused on acquiring premium-branded, focused-service and compact full-service hotels. RLJ Lodging Trust has a portfolio of 150 properties, comprised of 148 hotels with more than 22,300 rooms." (Dkt. 44 Ex. C at 2.) The Trust's website lists by state "all properties" without noting which RLJ entity may own those properties. (Dkt. 44 Ex. S at 2.) In its federal securities filings, the Trust states that it is an investment trust "that acquires primarily premium-branded, focused-service and compact full-service hotels." (Dkt. 44 Ex. B at 6.) In its press release on RLJ Trust's third quarter 2012 results, the Trust states that "the Company has initiated approximately $65 million of upgrades across 25 hotels." (Dkt. 44 Ex. P at 4.) Tellingly, the Trust defines *itself* in that press release (and not itself along with the L.P.) as the "Company."

(*Id.* at 2.)  The court thus rejects the Trust's arguments of separateness from the L.P. and concludes that RLJ L.P. regularly conducts the Trust's business.   "To find otherwise would allow [a] foreign corporation[ ] to purposefully exploit local markets and reap the benefits and advantages of doing business directly while insulating [itself] from lawsuits by using 'separate' subsidiaries and distribution networks to implement [its] business activity."  *Japax*, 542 N.E.2d at 797.

**D.**      **Constitutionality of exerting jurisdiction over RLJ Trust**.

For the reasons stated above, the court holds that it is constitutional to exert jurisdiction over RLJ Trust.  RLJ Trust "purposefully established 'minimum contacts'" with Illinois, *Burger King Corp.* v. *Rudzewicz,* 471 U.S. 462, 474, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985), such that exercising jurisdiction comports with "traditional notions of fair play and substantial justice." *International Shoe Co.* v. *Washington*, 326 U.S. 310, 316, 66 S. Ct. 154, 90 L. Ed. 95 (1945). Because of RLJ Trust's contacts with Illinois—both through its own activities and the activities of its subsidiaries the L.P. and the LLCs—it could reasonably foresee being haled into court in Illinois, satisfying the requirements of both the United States and Illinois Constitutions' Due Process Clause.  *See Montalbano* v. *HSN, Inc.*, No. 11 C 96, 2011 WL 3921398, at *2 (N.D. Ill. Sept. 6, 2011).  The Trust's motion to dismiss for lack of personal jurisdiction is therefore denied.

**II.**      **Venue**

RLJ Trust also moves to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(3) for improper venue.  It argues that venue is improper in the Northern District of Illinois because it is inappropriate to assert personal jurisdiction over it in this District.

Venue is proper because, as determined above, RLJ Trust is subject to personal jurisdiction here and is thus deemed a resident of this district.  *See* 28 U.S.C. § 1391(c)(2) (corporation is deemed a resident of any judicial district in which it is subject to the court's personal jurisdiction for that action); *Barela* v. *Experian Info. Solutions, Inc.,* No. 04 C 5144, 2005 WL 770629, at *2 (N.D. Ill. Apr. 4, 2005).  The Trust's motion to dismiss on this basis is therefore denied.

## CONCLUSION AND ORDER

For the foregoing reasons, RLJ Trust's motion to dismiss (dkt. 9) is denied.  This case is set for a status on **November 7, 2013 at 8:30 a.m.**

Date: October 23, 2013

_____
U.S. District Judge Joan H. Lefkow